**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:19-CR-00246-02 |
| v. | (Chief Judge Brann) |
| DAVID LYNN GRIFFITH, | |
| Defendant. | |

**MEMORANDUM OPINION**

**APRIL 18, 2022**

## I.    BACKGROUND

In 2019, David Lynn Griffith, along with his alleged coconspirator David Charles Bennett, was indicted for conspiracy to distribute controlled substances—those being heroin and methamphetamine—in violation of 21 U.S.C. § 846, and possession with intent to distribute controlled substances—that being 50 grams or more of a mixture containing a detectable amount of methamphetamine—in violation of 21 U.S.C. § 841(a)(1).[1] The indictment also contains a forfeiture allegation for currency and other property.[2]

That indictment arose from an incident that occurred on February 21, 2019, when Pennsylvania State Police ("PSP") Trooper Michael Tracy observed a 2002 Chevrolet Silverado (the "Silverado") with an out-of-date inspection sticker driving

---

[1]    Doc. 3.

[2]    *Id.*

in Towanda Borough, Bradford County, Pennsylvania.[3] Trooper Tracy attempted to pull the Silverado over, but the driver initially fled from Trooper Tracy, ignoring traffic signs and nearly striking another vehicle.[4] After a short pursuit, the Silverado pulled to the side of the road and the driver, Shayanne Place, "immediately got out of the vehicle and was waving her arms in the air [and] yelling loudly."[5] Trooper Tracy ordered Place to the ground, but she repeatedly refused those commands before ultimately complying.[6] Due to the driver fleeing and failing to stop, the matter had become a "felony stop," and Trooper Tracy therefore approached the passenger side of the Silverado and ordered Griffith from vehicle; Griffith was then handcuffed and taken into custody.[7]

Once the two individuals were in custody, Trooper Tracy searched Griffith for weapons and felt "a small bulge in his pocket," which Griffith admitted was methamphetamine.[8] Both doors of the Silverado remained open after its occupants had exited the vehicle and, when Trooper Tracy walked past the Silverado after having searched Griffith,[9] he "observed [through the open passenger side door] a medium sized plastic bag containing suspected methamphetamine and smaller

---

[3]   Doc. 76-3 at 2.
[4]   *Id.*
[5]   *Id.*
[6]   *Id.*
[7]   *Id.*; Doc. 98 at 11.
[8]   Doc. 98 at 15.
[9]   *See id.* at 66-67 (Trooper Tracy confirming that he discovered methamphetamine in Griffith's pocket prior to the discovery of methamphetamine in the Silverado).

plastic baggies in plain view on the passenger side floor where [] Griffith was sitting."[10] Based on his training and experience, the packaging of the substance, along with what Trooper Tracy believed to be "meth residue" on the bags, he concluded with near certainty that the bag contained methamphetamine.[11] Trooper Tracy did not have to move or touch any object in the Silverado to observe the suspected methamphetamine,[12] he did not enter the Silverado,[13] and, while it is "conceivable" that his head may have entered the vehicle while he looked at the plastic bag, that would only have occurred after he first observed the methamphetamine in plain view.[14]

Trooper Tracy confirmed that his dashcam video recorded the events of that day, but the video was not retained by PSP.[15] Trooper Tracy played no role in the decision not to retain that video and was unaware of who made that decision, although the decision was apparently made to protect the confidentiality of a police informant.[16] When a decision is made not to retain a video, it is not actively destroyed but, rather, is simply recorded over in the ordinary course of operating the dashcam.[17]

---

[10]   Doc. 76-3 at 2; *see* Doc. 98 at 15, 61-63. Based upon the pictures taken by police, it is apparent to the Court that the bag itself was in plain sight, as were its contents. *See* Government Exhibit 4 at 1, 9.

[11]   Doc. 98 at 15-17.

[12]   *Id.* at 16, 61-64.

[13]   *Id.* at 58.

[14]   *Id.* at 58-59, 78-79.

[15]   *Id.* at 45-46.

[16]   *Id.* at 47-48, 74.

[17]   *Id.* at 73-74.

PSP also recovered "in plain view" 37 needles and $578 in cash, including a $50 and $100 counterfeit bill.[18] Inside a small bag in the vehicle was a key for room 109 at the Crystal Springs Motel in North Towanda Township, Bradford County, Pennsylvania (the "Motel").[19] Place informed PSP that she and Griffith were on their way to the Motel because Griffith needed "to pick up some things from his room."[20]

Based upon this information, police obtained a search warrant for room 109 at the Motel.[21] There, police located drug paraphernalia, including "glass meth pipe[s]," hypodermic needles, drug packaging materials, a spoon with burnt residue on it, and documents demonstrating that Griffith had rented the motel room.[22] PSP then obtained a search warrant to conduct an additional search of the Silverado.[23] During that search police recovered pink colored pills, drug paraphernalia, plastic bags containing residue suspected to be methamphetamine, wax bags, a box of syringes, used syringes, four smart phones, three pocket knives, and a piece paper containing a phone number.[24]

In February 2021, Griffith filed a motion to disclose the identity of any Government informants, along with a motion suppress all evidence seized as a result of a warrantless search of the Silverado on February 21, 2019, and from searches

---

[18]   Doc. 76-4 at 4.
[19]   *Id.*; Doc. 98 at 21.
[20]   Doc. 76-4 at 4
[21]   Doc. 76-4.
[22]   *Id.* at 6-7.
[23]   Doc. 76-5.
[24]   *Id.* at 6.

executed pursuant to search warrants for the Motel on February 21, 2019, and the Silverado on February 22, 2019.[25] In his motion, Griffith also sought a *Franks*[26] hearing to determine whether the affidavits in support of search warrants were false or misleading.[27]

In February 2022, this Court conducted a hearing on Griffith's motion to suppress so that it could receive testimony from any witnesses and render credibility assessments, if necessary; the sole witness presented was Trooper Tracy.[28] The Court also permitted Griffith to explore any facts relevant to his *Franks* request at that hearing.[29] The motions are now ripe for disposition and, for the following reasons, Griffith's motion to suppress will be denied, while his motion for disclosure of the Government's informants will be granted in part.

---

[25]   Docs. 74, 76.

[26]   *Franks v. Delaware*, 438 U.S. 154 (1978).

[27]   Doc. 77 at 9-11.

[28]   Having conduct that hearing, the Court finds that Trooper Tracy's testimony was credible.

[29]   Doc. 98 at 4. In *Franks*, the United States Supreme Court held that a defendant may attack the issuance of a warrant if the warrant was based on untruthful information contained in the affidavit. 438 U.S. at 171. In requiring a truthful basis for the issuance of a warrant, the Supreme Court explained that it did "not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." *Id.* at 165. Consequently, to succeed in attacking a warrant, a defendant must come forward with "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Id.* at 171. Having heard the evidence and assessed Trooper Tracy's credibility, the Court concludes that there is no evidence that any of the statements made in the affidavits in support of search warrants were deliberately false or made in reckless disregard of the truth, and there is no basis to sustain Griffith's motion based upon *Franks*.

## II.    DISCUSSION

### A.    Motion to Suppress

With respect to any motion to suppress, "[a]s a general rule, the burden of proof is on the defendant who seeks to suppress evidence . . . [and] only once the defendant has established a basis for his motion does the burden shift to the government to show the search was reasonable."[30]

### 1.    Whether Warrantless Search was Lawful

Griffith first argues that suppression of any evidence discovered as a result of the warrantless search of the Silverado on February 21, 2019 is appropriate because no exception to a search warrant requirement applies here.[31] Griffith contends that the plain view doctrine does not apply because Trooper Tracy stuck his head inside the Silverado and "conducted a visual exploratory search" before seeing any items in the Silverado.[32] Moreover, Trooper Tracy only observed suspected methamphetamine and plastic baggies, which Griffith argues were "opaque objects and were not immediately apparent as drugs."[33]

The Government responds that the plain view exception applies, as the traffic stop was legal, Trooper Tracy justifiably looked into the Silverado and immediately observed in plain sight clear plastic bags that, based on his experience, contained

---

[30] *United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013) (internal citation and quotation marks omitted).

[31] Doc. 77 at 3-5.

[32] *Id.* at 4. *See id.* at 4-5.

[33] *Id.* at 4-5.

methamphetamine.[34] Regardless of the plain view exception, the Government contends that both searches of the Silverado were justified under the automobile exception to a search warrant because Trooper Tracy believed the Silverado contained evidence of a crime—here drug trafficking—"based on the initial observation of plastic bags containing methamphetamine plainly visible on the floor of the truck, the driver's failure to stop in response to emergency lights and siren, her efforts to evade the trooper during the pursuit, the driver's refusal to comply with directions to lay down, and her erratic and suspicious behavior."[35]

### i.    Plain View Doctrine

First, the warrantless search of the Silverado was permissible in accordance with the plain view doctrine. Pursuant to the Fourth Amendment's prohibition on "unreasonable searches and seizures,"[36] police must generally obtain a warrant—supported by probable cause—before conducting a search.[37] However, numerous exceptions to that general rule have arisen over time and, notably, "precedent has 'come to reflect the rule that if, while lawfully engaged in an activity in a particular

---

[34] Doc. 81 at 8-13.

[35] *Id.* at 16. *See id.* at 13-16. The Government also argues that any evidence seized from the Silverado is admissible under the independent source doctrine, as the facts to which Griffith's coconspirator admitted at his guilty plea hearing provides independent confirmation of the existence of the methamphetamine. Doc. 101 at 9-12. Because, as discussed below, the Court concludes that the searches were supported by probable cause or otherwise admissible under several exceptions to the exclusionary rule, the Court declines to address the Government's alternative argument at this time.

[36] U.S. CONST. AMEND. IV.

[37] *See, e.g.*, *Maryland v. Dyson*, 527 U.S. 465, 466 (1999).

place, police officers perceive a suspicious object, they may seize it immediately.'"[38]

This doctrine, known as the "plain view doctrine," permits the seizure of incriminating material that a police officer discovers in plain view.[39]

> There are three requirements for valid seizures of evidence in plain view. First, the officer must not have violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. Second, the incriminating character of the evidence must be immediately apparent. Third, the officer must have a lawful right of access to the object itself.[40]

All three requirements are met here. First, Trooper Tracy did not violate the Fourth Amendment in arriving where he viewed the methamphetamine. He observed the Silverado with an expired inspection sticker, and therefore initiated a routine, lawful[41] traffic stop based on that violation.[42] Rather than stop, the Silverado fled before eventually stopping, which caused Trooper Tracy to order the occupants from the vehicle, which was again lawful.[43] After the occupants exited the Silverado, they

---

[38] *United States v. Yamba*, 506 F.3d 251, 256 (3d Cir. 2007) (quoting *Texas v. Brown,* 460 U.S. 730, 739 (1983)).

[39] *Id.*

[40] *United States v. Stabile*, 633 F.3d 219, 241 (3d Cir. 2011) (internal quotation marks omitted). *See also Horton v. California*, 496 U.S. 128, 136 (1990).

[41] *See* 75 Pa. Stat. and Cons. Stat. Ann. § 4703 (operating a motor vehicle without displaying "a currently valid certificate of inspection" is a summary offense under Pennsylvania law); *United States v. Mosley*, 454 F.3d 249, 255 n.9 (3d Cir. 2006) ("A traffic stop requires only reasonable suspicion to believe that a traffic violation has been committed"). *Cf. Pegg v. Herrnberger*, 845 F.3d 112, 118 (4th Cir. 2017) (holding that officer had probable cause to stop and arrest individual for minor traffic violation of driving with an expired inspection sticker).

[42] Doc. 98 at 8-9.

[43] *Id.* at 9-13. *See Arizona v. Johnson*, 555 U.S. 323, 331 (2009) (reiterating "that 'once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures'" (quoting *Pennsylvania v. Mimms,* 434 U.S. 106, 111 (1977)).

left both the doors open and, as Trooper Tracy walked around the exterior of the Silverado, he viewed through the open door suspected methamphetamine in plain view in a plastic bag on the passenger side floor of the vehicle.[44] Consequently, Trooper Tracy's actions did not violate the Fourth Amendment.

Second, the incriminating character of the evidence was immediately apparent to Trooper Tracy. Trooper Tracy's experience and training in drug identification and detection at the PSP academy, along with his experience in making multiple drug arrests as a trooper—which familiarized him with the appearance and packing of methamphetamine—led him to conclude with near certainty that the substance he viewed in the plastic bag was methamphetamine.[45]

Third, Trooper Tracy had a lawful right of access to the object itself. He, or any member of the public, could easily view the passenger side floor of the Silverado through the open passenger door, and it is well-established that police officers may access "'that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.'"[46] As all three requirements of the plain view doctrine are met, the warrantless seizure of evidence from the Silverado was lawful, and Griffith's motion to suppress will be denied.

---

[44] Doc. 98 at 15.
[45] *Id.* at 15-17, 61-63, 77.
[46] *United States v. Hawkins*, 646 F. App'x 254, 257 (3d Cir. 2016) (quoting *Texas v. Brown,* 460 U.S. 730, 740 (1983)).

### ii.    Automobile Exception

Second, the warrantless search of the Silverado was permissible under the automobile exception to the warrant requirement. "The automobile exception permits vehicle searches without a warrant if there is probable cause to believe that the vehicle contains evidence of a crime."[47] The government bears the burden of establishing the applicability of the exception by a preponderance of the evidence."[48]

"Although 'the scope of the warrantless search authorized by the automobile exception is no broader and no narrower than a magistrate could legitimately authorize by warrant,' the automobile exception includes two important elements specific to that exception."[49] "First, 'if probable cause justifies the search, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.'"[50] "Second, probable cause does not dissipate after the automobile is immobilized because the exception does not include an exigency component."[51] "As a result, the government can search an impounded vehicle without a warrant even though it has secured the vehicle against the loss of evidence and it has the opportunity to obtain a warrant for the search."[52]

---

[47]  *United States v. Donahue*, 764 F.3d 293, 299-300 (3d Cir. 2014) (internal quotation marks omitted).

[48]  *Id.* at 300 (internal citations omitted).

[49]  *Id.* (quoting *United States v. Ross,* 456 U.S. 798, 825 (1982) (brackets omitted)).

[50]  *Id.* (quoting *Ross,* 456 U.S. at 825 (ellipsis and brackets omitted)).

[51]  *Id.*

[52]  *Id.*

"The probable cause inquiry is 'commonsense,' 'practical,' and 'nontechnical;' it is based on the totality of the circumstances and is judged by the standard of 'reasonable and prudent men.'"[53] Courts must "evaluate 'the events which occurred leading up to the search, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'"[54] "If there was a 'fair probability that contraband or evidence of a crime' would have been found, there was probable cause for the search."[55]

Based on Trooper Tracy's initial discovery of methamphetamine in the Silverado, he had probable cause to believe that additional evidence of drug possession or distribution would be found within that vehicle, as "[t]he presence of drugs in plain view in an automobile creates probable cause to search."[56] Not only did this give Trooper Tracy authorization to conduct an additional, more thorough search of the Silverado, but it also meant that Trooper Tracy "was justified in opening the bag found in the" Silverado where he discovered additional relevant

---

[53] *Id.* at 301 (quoting *Illinois v. Gates,* 462 U.S. 213, 230-31 (1983)).

[54] *Id.* (quoting *Ornelas v. United States,* 517 U.S. 690, 696 (1996) (ellipses and brackets omitted)).

[55] *Id.* (quoting *Gates,* 462 U.S. at 238).

[56] *Karnes v. Skrutski*, 62 F.3d 485, 499 (3d Cir. 1995), abrogated on other grounds by *Curley v. Klem*, 298 F.3d 271, 279 (3d Cir. 2002). *See also United States v. Hudson*, 346 F. App'x 903, 905 (3d Cir. 2009) (holding "once the officers, who had substantial experience with drug-related arrests, glimpsed multiple marked plastic baggies containing a white chunky substance in the center cupholder, they possessed probable cause to believe that the baggies contained illegal drugs, and that Hudson was involved in criminal activity. At that point, police were entitled to arrest Hudson and to search the passenger compartment of his vehicle" (footnote omitted)).

evidence.[57] Consequently, under the automobile exception, police were justified in conducting not only the initial warrantless search of the Silverado, but also the subsequent search of the Silverado pursuant to a warrant.

### iii.   Failure to Retain Dashcam Footage

Finally, Griffith asserts that evidence seized during the warrantless search of the Silverado should be suppressed because PSP failed to retain the dashcam video of the search and arrest on February 21, 2019, and the Court should infer bad faith from this action.[58] According to Griffith, the failure to retain that video "seriously undermines Trooper Tracy's credibility and his version of the events"[59] and, at a minimum, deprives the Court of the best available evidence and prejudices Griffith's ability to defend himself in this matter.[60] The Government responds that the absence of dashcam video is no reason to grant the motion to suppress, as the absence of such video does not alter the conclusion that methamphetamine was observed in plain view in the Silverado.[61]

The United States Supreme Court has held that "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's

---

[57] *Donahue*, 764 F.3d at 300.
[58] Doc. 97 at 2-5.
[59] *Id.* at 5.
[60] *Id.* at 5-6.
[61] Doc. 101 at 1-3.

defense."[62] "To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."[63] Where evidence is, however, only *potentially* exculpatory, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."[64]

Here, Griffith has failed to establish either that the dashcam footage is material, or that PSP acted in bad faith in failing to preserve the evidence.[65] First, there is no indication that the video was material, as Trooper Tracy credibly testified that, given the location of his vehicle in relation to the Silverado, any video recorded by the dashcam would not reveal Trooper Tracy's actions at the side of the vehicle, nor would it demonstrate whether the methamphetamine was in plain view.[66] This indicates that the failure to preserve the dashcam video "neither prejudiced [Griffith] nor affected the fairness of the proceedings."[67]

---

[62] *California v. Trombetta*, 467 U.S. 479, 488 (1984).

[63] *Id.* at 489 (internal citation omitted). *See also United States v. Tykarsky*, 446 F.3d 458, 478 (3d Cir. 2006) (holding that evidence was not material when its nondisclosure "neither prejudiced [defendant] nor affected the fairness of the proceedings").

[64] *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

[65] Because the contents of the video are unknown, the video may be described only as potentially exculpatory, and therefore Griffith must demonstrate bad faith.

[66] Doc. 98 at 74-75.

[67] *Tykarsky*, 446 F.3d at 478.

Second, there is no evidence of bad faith in the failure to retain the dashcam video. The video was apparently not retained because it depicted an informant, and PSP sought to preserve the informant's confidentiality.[68] Although Griffith argues that this is not a proper basis to fail to retain the video and, therefore, bad faith should be inferred, PSP regulations provide that "video recordings may be inappropriate" where, *inter alia*, PSP must protect "the anonymity of an informant or other confidential source of information."[69] And while Griffith contends that the failure to retain the dashcam video "seriously undermines Trooper Tracy's credibility,"[70] the uncontroverted evidence establishes that Trooper Tracy played no role in the failure to retain that video, and the decision not to retain the video therefore does not, in the Court's view, create an inference that Trooper Tracy's testimony is incredible, or that the video may contradict his version of events.[71] Consequently, the Court concludes that Griffith's rights have not been violated by the failure to retain the dashcam video, and exclusion of evidence on that ground is not warranted.

### 2. Whether the Search Warrants were Supported by Probable Cause

Griffith next argues that the searches pursuant to search warrants were unlawful because the affidavits in support of search warrants contain insufficient

---

[68]  Doc. 98 at 74.
[69]  Doc. 97-1 at 9.
[70]  Doc. 97 at 5.
[71]  Doc. 98 at 47-48, 74.

evidence that any of the items sought would be found in the Silverado or Motel, and therefore any evidence seized must be suppressed.[72]

As to the search of the Motel, the Government argues that the suspicious flight of the Silverado and subsequent behavior by its passengers, along with the suspected methamphetamine, cash, and drug paraphernalia discovered in the Silverado, gave PSP reason to believe that Griffith was involved in drug trafficking.[73] PSP also discovered that Griffith possessed a key card for room 109 at the Motel—a location where Place informed PSP that she and Griffith were headed so that Griffith could pick up some things from his room, which provided a direct nexus between Griffith and the Motel and permits the inference that the motel room would contain evidence of drug distribution.[74] The Government further argues that, even if the affidavits in support of the search warrants were deficient, the searches should be upheld under the good faith exception, as law enforcement reasonably believed that the warrants were supported by probable cause.[75]

When determining whether a warrant is supported by probable cause, "[a] reviewing court may not conduct a *de novo* review of a probable cause determination."[76] Rather, "[t]he duty of a reviewing court is 'simply to ensure that

---

[72] Doc. 77 at 5-9.
[73] Doc. 81 at 16-21.
[74] *Id.*
[75] *Id.* at 21-24.
[76] *United States v. Golson*, 743 F.3d 44, 53 (3d Cir. 2014) (citing *Illinois v. Gates,* 462 U.S. 213, 236 (1983)).

the magistrate had a substantial basis for concluding that probable cause existed.'"[77] "[I]f a substantial basis exists to support the magistrate's probable cause finding, [this Court] must uphold that finding even if a different magistrate judge might have found the affidavit insufficient to support a warrant."[78] Although this Court must "not merely rubber stamp a magistrate's conclusions, [it] must heed the Supreme Court's direction that 'doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.'"[79]

"A magistrate may find probable cause when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"[80] The United States Court of Appeals for the Third Circuit has "held that probable cause is a fluid concept that turns on the assessment of probabilities in particular factual contexts not readily, or even usefully, reduced to a neat set of legal rules."[81] "The supporting affidavit to a search warrant is to be read in its entirety and in a common sense, nontechnical manner."[82]

First, there was ample probable cause to support the search warrant for the Motel. The affidavit in support of the search warrant noted that Trooper Tracy had

---

[77] *United States v. Miknevich*, 638 F.3d 178, 182 (3d Cir. 2011) (quoting *Gates,* 462 U.S. at 238 (ellipsis omitted)).

[78] *Id.* (internal quotation marks omitted).

[79] *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (quoting *Gates,* 462 U.S. at 237 n.10 (internal citation omitted)).

[80] *Miknevich*, 638 F.3d at 182 (quoting *Gates,* 462 U.S. at 238).

[81] *Id.* (internal quotation marks omitted).

[82] *Id.*

attempted to stop the Silverado, but the vehicle fled for some time before stopping.[83] The affidavit also recounted that police recovered in plain view "68 grams of Methamphetamine, 37 needles," and cash and counterfeit bills.[84] Furthermore, Griffith had a key to room 109 at the Motel, and Place confirmed that she and Griffith were on their way to the Motel at the time of the stop because Griffith had "to pick up some things from his room" there.[85]

Although there is no direct evidence that Griffith stored drugs in his motel room, the Third Circuit has held that it is "a reasonable inference to conclude that drug dealers often store evidence of drug crimes in their residences."[86] This inference is present where there are "three preliminary premises: (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's drug activities."[87]

Here, all three preliminary premises are met. First, the affidavit detailed that Griffith possessed large quantities of methamphetamine and cash,[88] leading to the reasonable conclusion that Griffith was a drug dealer.[89] Second, the affidavit noted

---

[83]   Doc. 76-4 at 4.
[84]   *Id.*
[85]   *Id.*
[86]   *United States v. Burton*, 288 F.3d 91, 104 (3d Cir. 2002).
[87]   *Id.*
[88]   Doc. 76-4 at 4.
[89]   *Cf. United States v. Orgovan*, No. CRIM. 08-72, 2008 WL 4905653, at *2 (W.D. Pa. Nov. 13, 2008) (noting that "Defendant's possession of large amounts of cocaine and cash indicates that his dealing was substantial and significant"); *Cooley v. Brooks*, No. CIV. A. 07-285, 2009 WL 959870, at *3 (W.D. Pa. Apr. 8, 2009) (noting testimony that defendant was likely a drug dealer

17

that Griffith possessed a key to room 109 at the Motel, and the woman who was arrested with Griffith confirmed that Griffith was renting a room there, demonstrating that Griffith occupied that room.[90] Finally, the motel room contained contraband linking that room to Griffith's drug trafficking, including meth pipes, hypodermic needles, wax paper bags, glassine baggies, a silver spoon with burnt residue, and "rubber bands used to bind packets of drugs."[91]

Because all three preliminary premises were present, the magistrate judge had reason to infer that evidence of Griffith's drug trafficking activities would be found inside room 109 at the Motel.[92] Consequently, the magistrate judge had a substantial basis to conclude that the search warrant application was supported by probable cause, and Griffith's Fourth Amendment rights were not violated by the search of the Motel.[93]

---

based on, *inter alia*, "the quantity and packaging of drugs found, and the presence of . . . a large amount of cash").

[90] Doc. 76-4 at 4.

[91] *Id.* at 6-7.

[92] *Burton*, 288 F.3d at 104.

[93] Griffith further challenges the scope of the items sought at the motel. Doc. 77 at 8-9. However, as the Third Circuit has noted, "a dealer logically could conclude that his residence is the best, and probably the only, location to store items such as records of illicit activity, phone books, address books, large amounts of cash, assets purchased with proceeds of drug transactions, guns to protect drugs and cash, and large quantities of drugs to be sold." *United States v. Whitner*, 219 F.3d 289, 298 (3d Cir. 2000). Accordingly, there is good reason for the search warrant to have sought out broad classes of evidence from the motel room.

Second, there was sufficient probable cause to support the search warrant for the Silverado.[94] The affidavit in support of a search warrant discussed the stop of the Silverado and recounted the discovery of large quantities of methamphetamine and cash, along with orange cap needles in the vehicle.[95] Although Griffith challenges whether anyone could reasonably have concluded based upon that information that there would likely be evidence of firearms or cellphones in the Silverado, it is well established that "[c]ell phones and firearms are generally considered the 'tools of the trade' of drug traffickers."[96] The magistrate judge therefore reasonably concluded that there was probable cause to believe that the sought-after evidence would be discovered in the Silverado, and Griffith's motion to suppress will be denied.

Finally, the Court also concludes that, even if the search warrants were invalid, pursuant to the good faith exception the evidence resulting from those searches should not be excluded. "The exclusionary rule is a prudential doctrine that prevents the government from relying at trial on evidence obtained in violation of the Fourth Amendment's strictures."[97] "However, the rule is *not* intended to remedy

---

[94] Even if the warrant were somehow deficient, as discussed previously, the second search of the Silverado would have been justified under the automobile exception to the warrant requirement.

[95] Doc. 76-5 at 3.

[96] *United States v. Stevenson*, No. CR 16-189, 2019 WL 4919671, at *6 (W.D. Pa. Apr. 4, 2019). *See also United States v. Waller*, 654 F.3d 430, 434 (3d Cir. 2011) (testimony established that "drug dealers frequently carry loaded firearms for protection"); *United States v. Hinnant*, 529 F. App'x 217, 219 (3d Cir. 2013) (same); *United States v. Flemming*, 256 F. App'x 453, 455 (3d Cir. 2007) (same).

[97] *United States v. Werdene*, 883 F.3d 204, 215 (3d Cir. 2018) (brackets and internal quotation marks omitted).

Fourth Amendment violations, and does not necessarily apply each time a violation occurs."[98]

"Accordingly, in determining whether the exclusionary rule applies, [this Court must] engage in a cost-benefit analysis, balancing the deterrence benefits of suppression against its substantial social costs."[99] The United States Supreme Court has made clear that "[s]uppression of evidence . . . has always been our last resort, not our first impulse."[100] Thus,

> Where the particular facts of a case indicate that law enforcement officers acted with an objectively reasonable good-faith belief that their conduct was lawful, or when their conduct involved only simple, isolated negligence, there is no illicit conduct to deter. In such circumstances, the deterrence rationale loses much of its force and exclusion cannot pay its way. Alternatively, where law enforcement conduct is deliberate, reckless, or grossly negligent or involves recurring or systemic negligence, deterrence holds greater value and often outweighs the associated costs.[101]

The existence of a search warrant is usually sufficient to establish that an officer conducted a search in good faith, but there are cases in which an officer's reliance on a warrant is not reasonable and would fail to trigger the good faith exception.[102] In determining whether the good faith exception applies, this Court must determine "whether a reasonably well trained officer would have known that

---

[98]   *Id.*
[99]   *Id.* (brackets and internal quotation marks omitted).
[100]   *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).
[101]   *Werdene*, 883 F.3d at 215-16.
[102]   *United States v. Hodge*, 246 F.3d 301, 307-08 (3d Cir. 2001).

the search was illegal despite the magistrate's authorization."[103] This may occur in the following narrow situations:

(1) when the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;

(2) when the magistrate judge abandoned his judicial role and failed to perform his neutral and detached function;

(3) when the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

(4) when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.[104]

Griffith does not respond to the Government's invocation of the good faith exception and does not argue that any of the exceptions would apply here,[105] nor is the Court able to conclude that any of the exceptions are present in this case. There is no evidence that the warrants were deliberately or recklessly false or that the magistrate judge abandoned his judicial role. Nor could it reasonably be argued that the warrants failed to describe the places to be searched or the things to be seized. While Griffith does assert that there was no probable cause to search the Silverado or Motel, as discussed above, the Court finds that probable cause existed to support the search warrants, and the affidavits certainly cannot be described as "so lacking in indicia of probable cause as to render official belief in its existence entirely

---

[103] *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984).
[104] *Hodge*, 246 F.3d at 308 (brackets ad internal quotation marks omitted).
[105] *See* Doc. 83.

unreasonable."[106] Consequently, regardless of whether the search of the Silverado and Motel pursuant to search warrants were valid, the good faith exception applies, and any evidence seized will not be excluded.

### B.    Motion for Disclosure of Informants

Finally, with regard to the motion for the disclosure of the identity of the Government's informants, Griffith asserts that disclosure of their identities is necessary because an informant was likely a direct participant in any alleged illegal activity, their credibility will be central to any defense, and there is no credible safety concern that would weigh against release the informants' identities.[107]

The Government responds that Griffith has failed to identify any specific grounds for disclosure of the informants' identities, and his assertion that the informants may have participated in some of the criminal conduct is far too vague to support disclosure.[108] The Government further contends that it has serious concerns regarding witness intimidation should the informants' identities be disclosed too early.[109] Finally, the Government states that it will provide all relevant information no later than 72 hours prior to the informants' testimony at trial.[110]

With respect to disclosure of an informants' identity, such disclosure "is required where 'an informer's identity, or . . . the contents of his communication, is

---

[106] *Hodges*, 246 F.3d at 308.
[107] Doc. 75.
[108] Doc. 81 at 24-29.
[109] *Id.* at 29-30.
[110] *Id.* at 30-33.

relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause.'"[111] However, "the burden to demonstrate the need for disclosure rests on the defendant."[112] In meeting this burden, the Third Circuit has emphasized that "[t]he mere speculation that an eyewitness may have some evidence helpful to defendant's case is not sufficient to show the specific need required by *Roviaro*."[113]

Only if a defendant meets his burden will courts engage in a balancing test, weighing "'the public interest in protecting the flow of information against the individual's right to prepare his defense.'"[114] The results of that balancing test "will depend upon the particular circumstances of the case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."[115]

Here, Griffith has not satisfied his burden of demonstrating—in a concrete, non-speculative manner—the need for disclosure of the informants' identities at this time. First, Griffith speculates that the informants may have been involved in an underlying drug transaction that involved Griffith, based on the unsupported assertion that "soon after their arrest, before the state court preliminary hearing,

---

[111] *United States v. Johnson*, 677 F.3d 138, 143 (3d Cir. 2012) (quoting *Roviaro v. United States,* 353 U.S. 53, 60-61 (1957)).

[112] *Id.*

[113] *Id.* (internal quotation marks omitted).

[114] *United States v. Jiles*, 658 F.2d 194, 196 (3d Cir. 1981) (quoting *Roviaro,* 353 U.S. at 62).

[115] *Id.* (internal quotation marks omitted).

Messrs. Griffith and Bennett were advised that the charges were going to be transferred to federal court."[116] Absent some actual evidence—as opposed to mere speculation—to support the notion that the informants actually participated in the underlying criminal activity, the Court concludes that disclosure is unwarranted at this time.

Second, Griffith states in conclusory fashion that disclosure is required so that he may properly investigate the informants' credibility, "their motives to testify against [Griffith], and what benefits they might receive in exchange for their testimony."[117] Without a more specific assertion, the Court again concludes that Griffith has not satisfied his initial burden. Moreover, that Griffith may be able to discover information that undercuts the informants' credibility is insufficient to warrant disclosure. This is so because disclosing the identity of an informant will always allow a defendant to investigate and probe for impeachment material. However, as the Third Circuit has warned, "if disclosure . . . is required in every instance[,] the interests of law enforcement in combatting (crime) will be detrimentally affected by the emasculation of its only effective weapon[—]the informer."[118]

Finally, even if Griffith had articulated a need for disclosure, based on the available record the Court believes that the balance of equities tips against requiring

---

[116] Doc. 75 at 4. This assertion is unsupported by any evidence such as an affidavit or declaration.
[117] *Id.* at 5.
[118] *Jiles*, 658 F.2d at 197.

disclosure at this time. The Government has noted legitimate concerns for the safety of the informants based on Griffith's past conduct,[119] and this concern—combined with the strong public interest in preventing disclosure[120]—weighs against granting Griffith's motion.[121] Consequently, the Court concludes that there is insufficient evidence of need for disclosure, and any need is outweighed by the public's interest in maintaining the confidentiality of the informants' identities.

Nevertheless, it is clear that the Government must eventually turn over impeachment material related to the informants. In that regard, the Fifth Amendment to the United States Constitution requires that the Government disclose to a defendant any information within its possession that is material to guilt or punishment.[122] "When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule."[123]

The informants' credibility could be important to this case as their testimony may form a portion of the Government's case. As such, Griffith may be entitled to information regarding why the informants began cooperating with law enforcement.

---

[119] *See* Doc. 81 at 29-30 (noting potentially lengthy sentence should Griffith be convicted, and discussing Griffith's prior convictions for, *inter alia*, fraud, harassment, and criminal conspiracy).

[120] *See McCray v. Illinois*, 386 U.S. 300, 308-09 (1967) (detailing public interest reasons for protecting identity of informants).

[121] *See Jiles*, 658 F.2d at 198 (holding that the "very high risk of physical harm to the particular informant involved" weighed against disclosure despite particular need for disclosure).

[122] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[123] *Giglio v. United States*, 405 U.S. 150, 154 (1972) (internal quotation marks omitted).

However, that Griffith is entitled to this material does not mean he is entitled to this material immediately, as "[n]o denial of due process occurs if *Brady* material is disclosed to [defendants] in time for its effective use at trial."[124] The Third Circuit has made clear that a defendant's "right to a fair trial [is] fully protected if disclosure" of "information [the defendant] could use on cross-examination to challenge the credibility of government witnesses" is made as late as "the day that the witness testifies."[125]

The Government has offered to produce *Giglio* impeachment material three days prior to trial.[126] "The government is under no obligation to disclose such material prior to trial, yet the court has discretionary authority to compel pretrial disclosure of *Giglio* material to ensure the effective administration of the criminal justice system."[127] As a general matter, early disclosure of impeachment material is not required because "impeachment evidence does not require counsel to be given substantial time in advance to review."[128] However, consistent with this Court's past practice, rather than submitting materials three days prior to trial, the Government shall disclose to Griffith all *Giglio* materials "at least one week prior to a date-certain trial in this matter," as such a timeline "fully protects Defendant[']s rights to a fair

---

[124] *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983).

[125] *Id.*

[126] Doc. 81 at 33.

[127] *United States v. Crowder*, No. 4:17-CR-00291, 2019 WL 764350, at *3 (M.D. Pa. Feb. 21, 2019) (internal quotation marks omitted).

[128] *Id.*

trial and provides defense counsel with sufficient time to effectively utilize the information disclosed."[129] Consequently, Griffith's motion will be granted, but only to this extent.

## III.   CONCLUSION

For the foregoing reasons, the Court concludes that Griffith's Fourth Amendment rights were not violated by the searches of the Silverado or the Motel, and Griffith's motion to suppress will therefore be denied. Griffith's request to disclose the identity of the informants will be denied but, to the extent that his motion may be construed as a request for *Giglio* materials, that motion will be granted in part, and disclosure of *Giglio* material must occur no less than seven days prior to trial.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[129] *Id.*